# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PATRICIA SHUSTER, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | Case No. 06 C 4478 |
| v. ) | |
| ) | Judge Joan H. Lefkow |
| PEOPLE'S ENERGY CORPORATION, *et al.,* ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Patricia Shuster ("Shuster"), believes that she was terminated from her job because she was a 46-year-old woman and because she filed a charge of discrimination with the Equal Employment Opportunity Commission. She filed a three count complaint in this court alleging sex and age discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.* ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), as well as retaliation under both statutes. Defendants, People's Energy Corporation and North Shore Gas Company ("NSG") (collectively, "defendants"), have now moved for summary judgment on all three claims. Dkt. No. 26. For the following reasons, their motion will be granted and this case will be dismissed with prejudice and terminated.

## I. Facts

Patricia Shuster ("Shuster") is a woman who worked for North Shore Gas Company ("NSG") for almost 19 years: from June 2, 1986 until her involuntary termination on May 6, 2005. Defendants' L.R. 56.1(a)(3) Statement of Undisputed Material Fact (hereinafter "DS"), at

¶¶ 2, 4; Plaintiff's L.R. 56.1(b) Statement of Uncontested Facts (hereinafter "PS"), at ¶ 1. She

was 46 years old at the time of her termination. *Id*. NSG is an "employer" as that term is

defined by Title VII and the ADEA. DS, at ¶ 3.[1]

      Shuster's final position with NSG was "Fitter Over 4," a position which required her to

maintain and repair gas pipes, meters and appliances. DS, at ¶ 6. Fitter Over 4 is the highest

classification of fitter positions at NSG and is attained through a progression of time and

successively higher positions as set forth in the collective bargaining agreement that applied to

Shuster's employment. DS, at ¶ 8; PS, at ¶¶ 1, 2. Throughout the period of her employment

with NSG, Shuster was a member of a collective bargaining unit. DS, at ¶ 7. From 1993 until

approximately October, 2004, Shuster was directly supervised by various first-line supervisors,

who were in turn supervised by John Kleczynski ("Kleczynski"), NSG's former Manager of

Customer Service. DS, at ¶ 9. Shuster also reported indirectly to Calixto Arroyo ("Arroyo"),

NSG's Operations Manager. DS, at ¶ 9. At the time of her termination, Shuster had two direct

supervisors: Mark Ehman ("Ehman") and Tracy Gilliland ("Gilliland"). DS, at ¶ 10. Ehman

became Shuster's supervisor in the summer of 2001 and Gilliland in 2004. *Id*., Ex. 1 to Shuster's

Statement of Additional Material Facts (Shuster Deposition), at 67. Neither Ehmen nor Gilliland

had the authority to terminate Shuster's employment. DS, at ¶ 10.

      In or about May, 2002, Shuster underwent a random drug test in the course of her

employment with NSG. DS, at ¶ 11. She tested positive for cocaine use. *Id*. She neither

contested the results of the test nor requested to be re-tested. *Id*. In lieu of termination for the

---

[1] Defendants deny that Shuster was employed by People's Energy Corporation. NSG appears to be a subsidiary of People's Energy, which is Shuster's reason for believing that if she was employed by NSG, she was also employed by People's Energy. Because defendants' motion to dismiss will be granted in any event, it is not necessary to resolve this dispute.

2

positive test, on or about May 10, 2002 Shuster signed and entered into a "last chance agreement" (the "LCA") with NSG, also known as "Conditions for Continued Employment." DS, at ¶ 12. All Fitters Over 4 are required to submit to random drug tests and must comply with a last chance agreement if they fail a test. DS, at ¶ 13; PS, at ¶ 15.

The LCA provides, among other things, that Shuster would (a) observe all terms of a rehabilitation program, (b) obtain a written after-care plan from a treatment provider which would be approved by NSG's medical review officer and comply with all terms of the plan, and (c) comply with all terms of the medical review officer's return-to-duty letter. DS, at ¶ 14. It also states, above Shuster's signature, "It shall be my [the employee's] obligation to observe these conditions, and the Company does not undertake to ensure my compliance. Violation of any of these conditions will result in my discharge." Exhibit B to Defendants' Statement of Facts (Plaintiff's Responses to Defendants' Request for Admissions, Exhibit A (Shuster's LCA)).

The terms and conditions in Shuster's LCA set forth the standard policy for NSG employees who fail a random drug test. DS, at ¶ 17. Furthermore, termination for violation of an LCA is a "longstanding past practice" of NSG. DS, at ¶ 35. In fact, the defendants are unaware of any employee who has violated a last chance agreement within the five years preceding the date of Shuster's termination that was *not* terminated. DS, at ¶ 63 (referencing Exhibit I to Defendants' Statement of Facts (defendants' answers to plaintiff's first set of interrogatories (listing eleven terminated employees, ten being male (the exception being Shuster) and four being under 40))).[2]

---

[2] Shuster denies defendants' statement of fact number 63, but her citations in support of that denial do not support it, whereas defendants' citations do support their statement.

Shuster was on leave for outpatient treatment for approximately 30 days before returning to work at NSG. DS, at ¶ 19. She obtained a written after-care plan and a return-to-duty letter on or about June 17, 2002. DS, at ¶ 15. Shuster's return-to-duty letter, which she signed, set forth a number of compliance requirements, including that for a period of five years she would "abstain from the use of illicit drugs, alcohol, and prescription drugs that have not been prescribed by a physician." DS, at ¶ 16. Following her return, she was subjected to more frequent drug and alcohol testing and her work was monitored more closely. DS, at ¶¶ 19, 20.

Sometime in 2003, Shuster suffered a work-related injury to her knee, for which she filed a workers compensation claim. DS, at ¶ 21. Following her return to work, NSG placed Shuster on "light duty" for a period of time. *Id*. "Light duty was defined pursuant to negotiations between NSG and Shuster's union, and consisted of any task that fell within an employee's medical restrictions. *Id*.

On January 15, 2005, Shuster filed a charge of discrimination with the Equal Employment Opportunity Commission ("the E.E.O.C.") against "Peoples Energy North Shore Gas" alleging that a one-day and a three-day suspension she received were the result of sex and/or age discrimination. DS, at ¶ 22. The E.E.O.C. dismissed this charge and issued Shuster a notice of right to sue on March 28, 2005. DS, at ¶ 23. Shuster failed to initiate a federal lawsuit within 90 days of receiving that right to sue. *Id*.

Shuster believes that she was discriminated and retaliated against in various ways over the course of her employment for being a woman, for being over the age of 40, for filing a workers compensation claim and for filing her first charge of discrimination with the E.E.O.C. She has testified that Ehmen generally treated her badly, as did other supervisors, including Brad

4

Lewis, Gilliland, and Kleczynski. DS, at ¶¶ 48, 58-60. Beginning at the time that Ehmen became her supervisor in 2001 and continuing through the day she was terminated, he always assigned her more work than the other fitters. DS, at ¶ 48; Shuster Deposition, at 37.³ After she tested positive for cocaine use in 2002, Ehmen began giving Shuster so much work that she could not

---

³ Shuster filed an affidavit in support of her response to defendants' motion for summary judgment. Ex. 2 to Shuster's Statement of Additional Material Facts (Shuster Affidavit). Many of the statements contained in her affidavit are vague, contrary to her deposition testimony, or lack foundation. For example, she states "After I filed my EEOC charge of discrimination, the harassment against me stepped up. Mr. Ehmen found the opportunity to criticize everything that I did at work. He was constantly threatening me with suspensions and write-ups." Shuster Affidavit, at ¶ 14. In contrast, she testified as follows in her deposition, at pages 52-54:
> Q: So the types of retaliation you were suffering for filing a worker's compensation claim continued after you filed your EEOC charge?
> A: Yes.
> Q: Okay. Did you suffer any retaliation after filing your EEOC charge that you weren't already suffering in retaliation for your worker's compensation claim?
> A: Yes.
> Q: And what was that?
> A: The overload of work once again.
> Q: Okay.
> A: I was being treated differently than my co-workers. I'll give you another for instance: The missing ID card I got disciplined for. The next day Charlie came in without his ID card, and Mark Ehmen told him to go home and get it. Nothing happened to Charlie.
> Q: Well, Ms. Shuster, you've already testified that Mr. Ehmen had been giving you too much work, an overload of work so you couldn't take lunches or breaks, back to when you tested positive for drugs, isn't that correct?
> A: Yes, but it was ongoing.
> Q: All right. Well, continue.
> A: It continued.
> Q: It continued from 2002 through date of your termination?
> A: Yes.
> Q: The ID card incident, do you recall when that happened?
> A: No, I don't recall it.
> Q: Well, it was prior to January, 2005, wasn't it?
> A: Yes.
> Q: How else, if there are any ways, were you treated differently than your co-workers in retaliation for having filed an EEOC charge, if there are any ways different than what you already told me?
> A: No.

In other parts of her affidavit, Shuster states that male fitters were not disciplined for certain things that she was disciplined for. These statements lack foundation, however, because Shuster does not explain how she knows that those fitters were not disciplined. In her deposition, Shuster at times testified that another fitter was not disciplined, but later admitted that she did not know whether or not that fitter was disciplined. *See, e.g.*, Shuster Deposition, at 53, 82-83. For these reasons, the portions of Shuster's affidavit that are not supported by the record (or are otherwise not competent), such as affidavit paragraphs 10, 12, 14, and 15, cannot be used to defeat summary judgment. *See Comcast of Illinois X, LLC* v. *Toguchi,* 2007 WL 4557818, at *2 (N.D. Ill. Dec. 21, 2007) (citing, *inter alia*, *Patterson* v. *Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir.1998) ("self-serving affidavits without factual support in the record will not defeat a motion for summary judgment.")).

take lunches or other breaks. Shuster Deposition, at 48. Shuster knew of other fitters who also felt that they had too much work and could not take breaks because of their workload. DS, at ¶ 48.[4]

Shuster has testified about various other instances of what she believes was discrimination or retaliation. For example, sometime prior to January, 2005, she was reprimanded for losing her identification badge. DS, at ¶ 55. She testified that a male employee who lost his badge, Charlie Walker, was not reprimanded, but later admitted that she does not know whether Walker received any discipline or not. *Id*. Second, following her knee injury and return to work on light duty status, Ehmen assigned Shuster to scrape paint off of a stairwell, which Shuster believes was contrary to her doctor's instructions. DS, at ¶ 46. Two male employees who were also on light duty were allowed to perform office work. DS, at ¶ 47. Shuster does not know what those employees' medical restrictions were. *Id*. Third, Shuster testified that she was fired for failing a drug test while certain male employees were not. DS, at ¶ 51.[5] She does not know whether any of those employees were subject to a last chance agreement. *Id*.[6] Fourth, Shuster was harassed for having a messy truck, while she observed that

---

[4] As one example of how Ehmen generally treated her badly, Shuster says that on numerous occasions when she asked for assistance on a job, Ehmen would tell her that she was the professional and that she should figure things out on her own. PS, at ¶ 4. Part of Ehmen's job was to assist employees that were having difficulties. PS, at ¶ 11.

[5] Shuster effectively admits elsewhere, however, through failure to support a denial of defendants' statement, that she was terminated because her supervisors believed that she had violated the terms of her last chance agreement. DS, at ¶ 34; see *infra*, at n10.

[6] Shuster denies this statement, and others, as "vague, conclusory, and speculative in nature," and declines to otherwise respond to it, citing *Hartman* v. *Pena*, 914 F. Supp. 225, 231 (N.D. Ill. 1995); *Malec* v. *Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). First, the cited cases do not support Shuster's belief that she may object to statements of fact without otherwise responding. Second, the defendants' statement was not vague, conclusory, or speculative. The court therefore deems the statements to which Shuster has merely "objected" as admitted if they are supported by the defendants' citations to the record.

certain male fitters had similarly messy trucks but did not observe them being harassed. DS, at ¶ 54, Ex. 2 to Shuster's Statement of Additional Material Facts (Shuster's Affidavit), at ¶ 9. Fifth, Shuster was accused of being late to work when she was not late. DS, at ¶ 49. On at least one occasion when she received a verbal warning for being late, Shuster observed two male employees arrive after she did, but the men were not disciplined. Shuster Dep., at 39. Sixth, Shuster was passed over for a promotion that she wanted in December of 2002 or January of 2003 and the position she wanted went to a man.[7] DS, at ¶ 56. Shuster does not know what that man's education, experience, performance history or disciplinary history was. *Id*. Finally, Shuster was not allowed to attend a retirement luncheon, refused a requested vacation day, and berated for not completing a job when two male Fitters over 4 had also failed to complete it but were not yelled at like she was. DS, at ¶ 49; PS, at ¶ 5.

Shuster does not differentiate between which of the above actions against her were evidence of discrimination versus retaliation. She believes that any and all adverse actions taken by NSG against her were the result of discrimination, retaliation for filing a workers compensation claim, or retaliation for filing her 2005 discrimination charge. DS, at ¶ 61. She believes that it is "all connected" and "all together." *Id*.

On Friday, April 29, 2005, Shuster attended a retirement party for an NSG colleague named Danny Paulausky at Louie's, a restaurant and bar in Waukegan, Illinois. DS, at ¶ 24, PS, at ¶ 17. Tim Rossman ("Rossman"), a supervisor in distribution at NSG, was also present at the party, as was Ray Deatheridge ("Deatheridge"), a general supervisor for NSG. DS, at ¶ 25; PS,

---

[7] Shuster believes that this man was under 40 years old, but her basis for that belief is hearsay evidence. Shuster Deposition, at 84.

at ¶ 18. Rossman insisted on buying all of the attendees a drink to toast Paulausky. PS, at ¶ 19. Shuster ordered an alcoholic beverage called an "old fashioned." PS, at ¶ 19.

Deatheridge called both Ehmen and Kleczynski to tell them that Shuster was drinking at the retirement party. DS, at ¶ 25; PS, at ¶¶ 22-24. Kleczynski then called Arroyo to tell him that another supervisor had witnessed Shuster drinking at the retirement party and that Arroyo needed to investigate the matter. DS, at ¶ 25; PS, at ¶ 25. On Tuesday, May 3, 2005, Shuster was called to attend a meeting with Arroyo.[8] DS, at ¶ 27; PS, at ¶ 26. She was represented at that meeting by her union representative, Tony Roemer. *Id*. Arroyo asked Shuster if she had ordered a drink at the Paulausky retirement party. DS, at ¶ 29; PS, at ¶ 27. Before she answered the question, Roemer asked for a break to speak with Shuster in private; he did so because he "wanted to discuss with her what type of an answer she was going to give." Roemer has believed that if Shuster were to answer the question truthfully, she would be admitting to a violation of her last chance agreement. DS, at ¶ 29. After returning from the break, Arroyo asked Shuster if she ordered a drink at the party; Shuster said "yes." DS, at ¶ 30. Shuster told Arroyo that she ordered an old fashioned, which, she explained, contains Southern Comfort, sour and fruit. *Id*. Neither Shuster nor Roemer told Arroyo that Shuster did not "drink" or "have" the old fashioned. DS, at ¶ 31.[9] Arroyo placed Shuster on indefinite suspension pending

---

[8] On the morning of May 3, 2005, before her meeting with Arroyo, Shuster was first called to attend a meeting with Ehmen in which Ehmen accused her of being a few minutes late to work. DS, at ¶ 26. She received a verbal reprimand for tardiness, but no other consequences were applied in that meeting. *Id*.

[9] Shuster now contends that she ordered the drink but did not drink it. PS, at ¶ 30. To this contention, defendants respond that while Shuster's allegations are unsupported by the record, they are also immaterial, and therefore for the purposes of the motion, defendants admit them.

8

termination based on his belief that she had an alcoholic drink at the retirement party. DS, at ¶ 32; PS, at ¶ 29.

After his May 3, 2005 meeting with Shuster, Arroyo told Kleczynski about it: specifically, he relayed that Shuster had admitted to drinking alcohol. DS, at ¶ 33. Other NSG executives, John Just, the General Manager of Field Operations, and Edward Doerk, the Vice President of Gas Operations, in cooperation with NSG's Human Resource Department, decided to terminate Shuster's employment because they believed that Shuster had violated the terms of her LCA. DS, at ¶ 34.[10] NSG converted Shuster's indefinite layoff to a termination on or about May 12, 2005. DS, at ¶ 36. Shuster was notified by letter from NSG that she was being terminated "for violation of the 'Last Chance Agreement' dated May 10, 2002.'" *Id*. Other than this violation, defendants had no other reason for terminating Shuster. PS, at ¶ 35.[11] Shuster never had a second positive drug test. PS, at ¶ 32.[12] NSG did not replace or seek to replace Shuster following her termination. DS, at ¶ 37. Under the terms of the collective bargaining agreement in place between NSG and the union, NSH could not simply hire a replacement to become a Fitter Over 4. *Id*.

---

[10] Shuster denies defendants' statement number 34, but her citations in support of that denial do not support it, whereas defendants' citations do support their statement.

[11] Just testified that whether or not Shuster had alcohol in her system was not important in his decision to terminate her. PS, at ¶ 31. Defendants respond that this statement was taken out of context, because what Just said before that was that what was important to his decision-making process was whether Shuster *drank* the alcohol. Their citations in support of this response refer to a page of Just's deposition (18) that the court has not found in the record; however, the court accepts the defendants' counsels' representations, which are made as officers of the court.

[12] Just was not aware of any other NSG employees who were terminated for violating an LCA while not having a second positive drug test. PS, at ¶ 33. Defendants note that according to the E.E.O.C's investigation, of the eleven employees terminated for violating an LCA during the five years preceding Shuster's termination, two were terminated for failure to comply with return-to-duty requirements, two for failing to abstain from alcohol, and seven for second positive drug tests. Defendants' reply, at 5 n.6.

After she was terminated, Shuster filed a second charge of discrimination with the E.E.O.C. DS, at ¶ 38; PS, at ¶ 36. She received a right to sue on this charge and timely commenced this lawsuit within 90 days thereafter. DS, at ¶ 44.[13]

## II. Summary Judgment Standard

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must look beyond the pleadings and assess the proof as presented in the record. Fed. R. Civ. P. 56(c) Advisory Committee's notes. The court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986); *Abdullahi* v. *City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).

The party seeking summary judgment bears the burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *Ruffin-Thompkins* v. *Experian Info. Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). In response, the non-moving party cannot rest on bare pleadings alone but must use evidentiary tools to designate specific material facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir.

---

[13] Defendants contend that Shuster committed perjury when filing her 2006 discrimination charge with the E.E.O.C. by, inter alia, alleging that she was "terminated for arriving to work one minute late," while knowing that that was not the real reason for her termination. They also allege that the perjury continued in this proceeding when Shuster responded to defendants' request for admissions. *See* DS, at ¶¶ 38-44, 62. Defendants request that the court impose sanctions on Shuster for this alleged perjury. Because the court is not privy to all of the circumstances surrounding Shuster's interactions with the E.E.O.C. and because judgment will now be entered against her, the court declines to address these allegations at this time.

2000).  A material fact must be outcome determinative under the governing law.  *Insolia*, 216 F.3d at 598-99.  Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex,* 477 U.S. at 322.

**III.     Discussion**

Title VII makes it unlawful for an employer to discharge or otherwise to discriminate against an employee because of his sex, 42 U.S.C. § 2000e-2(a)(1), and the ADEA similarly prohibits discrimination on the basis of age.  29 U.S.C. § 623(a)(1).  Both statutes also prohibit an employer from retaliating against an employee for complaining about discrimination. 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).

Claims for both gender and age discrimination "may be proven either directly ... or indirectly under the burden-shifting method established in *McDonnell Douglas*."  *Scaife* v. *Cook County*, 446 F.3d 735, 739 (7th Cir. 2006) (citing *McDonnell Douglas Corp*. v. *Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)); *Hemsworth* v. *Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).  Under the direct method, a plaintiff may prove his case through direct evidence (such as an admission by the decision maker that his actions were based on unlawful animus) or through circumstantial evidence, "i.e., evidence that allows a jury to infer intentional discrimination by the decisionmaker."  *Rogers* v. *City of Chicago*, 320 F. 3d 748, 753–54 (7th Cir. 2003) (citations omitted); *Hemsworth*, 476 F.3d at 490.  Under the direct method, the plaintiff's evidence must be sufficient to permit a jury "to conclude that the employer acted because of a forbidden animus."  *Rogers,* 320 F.3d. at 754.

11

Similarly, a claim for retaliation may be proven indirectly or directly. *Scaife,* 446 F.3d at 739. "Under the direct method, a plaintiff is required to show that '(1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two.'" *Dorsey* v. *Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007). The plaintiff may use either direct or circumstantial evidence to do so. *Id.*

To prove discrimination under the *McDonnell Douglas* indirect method, a plaintiff must first make out a prima facie case, such as by showing that "(1) she is a member of [a] protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) her employer treated similarly situated [] employees [not in the protected class(es)] more favorably." *Peirick* v. *Indiana Univ.-Purdue Univ. Indianapolis Athletics Dept.*, – F.3d –, 2007 WL 4355360, at *4 (7th Cir. Dec. 14, 2007) (citations omitted); *Barricks* v. *Eli Lilly & Co.*, 481 F.3d 556, at 559 (7th Cir. 2007). To establish a prima facie case of retaliation under this method, the plaintiff must show that "(1) he engaged in statutorily protected activity; (2) he was performing his job according to his employer's legitimate expectations; (3) he suffered a materially adverse action; and (4) he was treated worse than a similarly situated employee who did not engage in statutorily protected activity." *Graham* v. *AT&T Mobility, LLC*, Nos. 06-3020, 06-3734, 2007 WL 2565999, at *3 (7th Cir. Sept. 6, 2007). Thus, the second, third, and fourth elements of a prima facie case of retaliation are essentially the same as those of a prima facie case for discrimination. The plaintiff bears the burden to establish this prima facie case. *Scaife*, 446 F.3d at 739.

In either the discrimination or the retaliation context, "once the plaintiff has established a prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory

reason for the adverse employment action." *Scaife*, 446 F.3d at 739. If the defendant provides a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is merely a pretext for unlawful discrimination. *Scaife*, 446 F.3d at 739–40. "To show pretext, plaintiff must show more than defendant's decision was mistaken, ill considered, or foolish, and as long as the employer honestly believes [its stated] reasons, pretext has not been shown.... The only concern in reviewing an employer's reasons for [a] termination is the honesty of the employer's beliefs." *Kodl* v. *Bd. of Educ. School Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007).

### A. Shuster's Sex and Age Discrimination Claims

Shuster chose to proceed under the indirect method to prove her sex and age discrimination claims. The court will therefore analyze her arguments using the *McDonnell Douglas* burden-shifting method. With regard to her prima facie case, there is no dispute that she satisfies the first and third of the four elements: she is a member of protected classes and she suffered an adverse employment action when she was terminated from her job at NSG.[14]

Shuster first attempts to show that defendants treated similarly situated employees not in her protected classes more favorably by arguing that "similarly situated male employees were not terminated for having one positive drug test, while plaintiff was terminated after having one positive drug test." Shuster's response, at 7. She contends that of the eleven employees who were terminated for violating their LCAs during the five years preceding her termination, she was the only one terminated without having a second positive drug test.[15] Therefore, she argues,

---

[14] Shuster has not argued that any other events constituted an adverse employment action.

[15] While ultimately unnecessary to the court's analysis, defendants represent that this belief is factually incorrect, and that of the eleven terminated, two were terminated for failure to comply with return-to-duty requirements and two for failing to abstain from alcohol, with the remaining seven for second positive drug tests.

similarly situated males were afforded the opportunity of a second drug test to prove whether or not they violated their LCAs. She also points to male employees who had a first positive drug test, but did not have a second positive test, and were not terminated.

This argument assumes that the only way an employee could violate his or her LCA was through testing positive for drug or alcohol use a second time. But Shuster has pointed to no reason why a second positive test would be the only method of showing an LCA violation. Her LCA required, among many other things unrelated to drug and alcohol use, that she comply with all terms of the medical review officer's return to duty letter. One of those terms was to abstain from using alcohol. If the defendants had reliable evidence that Shuster violated that provision, nothing in her LCA (or any other source that Shuster has pointed to) required a drug test.[16] Furthermore, Shuster's comparison of herself to the employees who had a first positive drug test but were not terminated is inapposite because she too was not terminated after only a single positive drug test; the defendants relied on their belief that she later violated her LCA by drinking alcohol, whereas there is no evidence that those other employees violated their LCAs. For these reasons, Shuster has failed to identify any similarly situated younger or male employees that were treated more favorably than she was.[17]

Even assuming that Shuster was able to prove her prima facie case, however, Shuster cannot prove that the defendants' reason for terminating her was pretextual. She has essentially

---

Defendants' reply, at 5 n.6 (citing the E.E.O.C.'s investigation file for Shuster's 2006 charge).

[16] Administering a test for alcohol four days after the fact would likely have been inconclusive in any event.

[17] In support of her age discrimination claim, Shuster also argues that she was 46 at the time of her termination and a younger fitter will presumably be brought up through the ranks to replace her. This contention is wholly speculative and cannot be credited. Furthermore, Shuster has not cited any competent evidence of a single age of any of her allegedly similarly-situated employees. Without doing so, she cannot possibly satisfy her burden to show that similarly situated younger employees were treated more favorably than she was.

14

admitted that it was not. Shuster first argues that the defendants based their decision to terminate her on "inaccurate" information and should have administered a drug test instead of relying on the word of other managers that Shuster had consumed alcohol. As stated above, however, a "plaintiff must show more than defendant's decision was mistaken, ill-considered, or foolish, and as long as the employer honestly believes [its stated] reasons, pretext has not been shown…." *Kodl*, 490 F.3d at 562. Therefore, the question of pretext in this case has nothing to do with whether or not Shuster actually drank the alcohol, but only with whether or not NSG's decision makers believed that she did and terminated her for that reason.

Despite the fact that she was clearly aware of the reason why Arroyo was asking her questions about whether she ordered a drink at the retirement party, Shuster did not tell him that she did not "have" or "drink" the old fashioned after admitting that she did order it. Such an omission would lead a reasonable person to only one conclusion: that she did drink it. And if Arroyo believed that Shuster had admitted to drinking alcohol, he had no reason to administer a drug test. Shuster admits that Arroyo placed her on indefinite suspension pending termination based on his belief that she had an alcoholic drink at the retirement party, PS, at ¶ 29, that Arroyo told Kleczynski that she had admitted drinking alcohol, DS, at ¶ 33, and that John Just and Edward Doerk made the decision to terminate her because they believed that she had violated her LCA. DS, at ¶ 34. Thus, there is significant evidence in the record that the defendants honestly terminated Shuster because they believed that she had violated her LCA by drinking alcohol at the Paulausky retirement party, and so far, none to the contrary.

Shuster also cites circumstantial evidence in support of her effort to show pretext. *Peirick* supports this approach; in that case, the Seventh Circuit acknowledged that suspicious

15

circumstances can create a jury question regarding whether an employer's stated reasons were pretextual. 2007 WL 435560, at *10. Shuster's proffered examples of suspicious conduct, however, are all legally insufficient. First, she notes that she never tested positive for a second drug test. The lack of merit to this point has already been discussed above: the defendants reasonably believed that Shuster violated her LCA despite the absence of a second positive test. Second, she says that a final decision-maker, John Just, testified that whether or not Shuster had alcohol in her system was not important in his decision to terminate her. Defendants have effectively responded to this point as well by providing the context for this statement, which renders it insignificant. Third, Shuster cites the "inconsistent application of Defendants' policy regarding LCA to different individuals." Shuster's response, at 9. She does not elaborate, so the court presumes that she is referring to the defendants' failure to administer a drug test to prove that she had consumed alcohol. As also discussed above, this point is not persuasive because a test was not the only way to prove a violation of an LCA. Fourth, Shuster says that in all other material respects she was meeting the defendants' legitimate employment expectations. Because Shuster has otherwise failed to raise any suspicions regarding the defendants' truthfulness, this point is immaterial. Furthermore, the court notes that Shuster has admitted that it is a longstanding past practice of NSG to terminate any employee who violates an LCA, DS, at ¶ 35, and that every employee who violated an LCA during the five years preceding Shuster's termination was also terminated. DS, at ¶ 63. For all of these reasons, Shuster has failed to show that she was terminated because she was a 46-year-old woman.

   B.   **Shuster's Retaliation Claims**

Shuster argues that she can establish a prima facie case of retaliation under either the direct or the indirect method of proof. Because her indirect method effort fails due to the reasons just discussed, the court will only address her arguments under the direct method. First and second, Shuster engaged in a statutorily protected activity by filing her discrimination charge with the E.E.O.C. in 2005 and she indisputably suffered an adverse employment action when she was terminated. Therefore, to succeed under the direct method, Shuster must show a causal connection between the two. She attempts to do so with circumstantial evidence.

In support of the existence of a causal connection, Shuster cites statements from her statement of additional facts and her affidavit that this court has found incompetent: that discriminatory behavior against her, including verbal reprimands from Ehmen, increased after she filed her 2005 charge with the E.E.O.C. Therefore, Shuster is left only with her contentions that Ehmen harassed her for being late when similarly situated younger male employees were not harassed, that defendants falsely accused her of violating her LCA, and after the LCA accusation came down, and that defendants concocted a sham investigation in order to terminate her.

Shuster's allegations regarding being late consist of her general assertion that Ehmen accused her of being late all the time when she was not and her citation of one instance in which she was reprimanded for being late while two male employees who arrived after she did were not reprimanded. Her allegation that she was harassed all the time for being late when she was not late is too vague to be material. Her allegations regarding the incident when she was reprimanded but the two men were not lack the context necessary to make them material and a foundation showing how she knows that the men were not disciplined. Regardless, Ehmen and Kleczynski, the supervisors who reprimanded Shuster for tardiness, did not make the decision to

terminate her; John Just and Edward Doerk did. Finally, Shuster's claims that she was falsely accused of violating her LCA and that the defendants concocted a sham investigation are not supported by citations to the record, are speculative, and are undermined by the evidence cited above supporting the defendants' reasoning as truthful.

Shuster argues that in combination with the above evidence, the temporal proximity between her filing of the E.E.O.C. charge on January 15, 2005 and her termination on May 12, 2005 establishes the causal link between her filing and her termination. Four months, however, is not enough on its own to establish causation. *See Kodl*, 490 F.3d at 563 (two-month time period, standing alone, was insufficient to create a triable issue of causation). Furthermore, the court notes that Shuster has elsewhere alleged that Ehmen treated her badly from the moment he became her supervisor in 2001, long before she filed with the E.E.O.C., and she has offered no reason to believe that the alleged mistreatment discussed here was related to her filing. For these reasons, Shuster has failed to establish a prima facie case of retaliation.[18]

## IV. Conclusion and Order

For the foregoing reasons, defendants' motion for summary judgment [# 26] is granted. This case is dismissed with prejudice and terminated.

DATED: January 8, 2008  ENTER: *Joan N. Lefkow*
                                                      JOAN HUMPHREY LEFKOW
                                                    UNITED STATES DISTRICT JUDGE

---

[18] The court also notes that Shuster's statements that all of her mistreatment was "all connected" and "all together" further undermine her effort to establish any causation between her 2005 E.E.O.C. charge and any alleged mistreatment that followed. *See* DS, at ¶ 61.